Filed 8/27/25  P. v. Winkle CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. BENJAMIN FRANKLIN WINKLE, Defendant and Appellant. | D085872 (Super. Ct. No. SWF2102048) |


APPEAL from a judgment of the Superior Court of Riverside County, John M. Davis, Judge.  Affirmed.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Flavio Nominati, Deputy Attorneys General, for Plaintiff and Respondent.

Benjamin Franklin Winkle shot and killed a close friend and was convicted by a jury of second degree murder and possession of a firearm by a prohibited person. He was sentenced to 35 years to life in prison. During the trial, his former girlfriend, E.M., who was with Winkle just before his arrest, testified that Winkle threatened her and she feared for her life.

On appeal from the judgment of conviction, Winkle argues that the trial court improperly admitted this testimony into evidence. Relatedly, Winkle contends the District Attorney committed prosecutorial misconduct by eliciting the testimony and asserting in his closing argument that Winkle threatened to kill E.M. Winkle also asserts that by failing to adequately object to E.M.'s testimony and the District Attorney's closing argument, his counsel provided constitutionally ineffective assistance of counsel. As we explain, we reject Winkle's arguments and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Case*

Winkle owned several properties in California, including a rural property in Anza, which he used to farm marijuana. The victim, Michael Mendoza, was Winkle's long-time friend and helped him take care of the Anza property. Mendoza regularly stayed at the property and Winkle came down from his home in Northern California every month or two to visit. The property was remote, but there were a few neighbors. R.H. lived down the hill from Winkle's property and had known Winkle for about 15 years. T.S., another neighbor, lived in a trailer near Winkle's property and had known Winkle and Mendoza for about five years.

Four years prior to the murder, Mendoza asked T.S. to look after a .45 caliber firearm that was given to him by Winkle. The gun was wrapped in a plastic shopping bag and T.S. agreed to store the weapon in his trailer.

Winkle also owned a dog-breeding business with L.N., his ex-girlfriend and the mother of his young child. Winkle and L.N. were together about 10 years and separated about a month before the murder. When they were together they sold the dogs, Presa Canario and French Bulldog breeds, and shared the profits. As a result of the separation, their relationship was strained. At the time of murder, Winkle had some of the dogs in his possession and L.N. was trying to get them back from him, including a mother Presa Canario and her four puppies.

On the morning of October 6, 2021, Winkle and Mendoza arrived at the Anza property after driving there from Northern California in Winkle's minivan. They planned to pick up a BMW that was kept on the property for Mendoza to drive. Winkle also brought the four puppies with him and intended to take the dogs to Los Angeles to have their ears clipped. After they arrived at the Anza property, Winkle and Mendoza went to T.S.'s trailer around 9:00 a.m. T.S. saw Winkle drinking beer and testified Winkle was slurring his speech and appeared drunk. Winkle asked T.S. to return his gun and T.S. gave the gun back to Winkle still in the plastic shopping bag. Winkle also retrieved a truck from T.S.'s property that T.S. had borrowed.

Shortly after, T.S. walked over to Winkle's property and saw Winkle and Mendoza working on hitching a trailer to the truck. While helping Winkle and Mendoza with the truck, T.S. received a call from a friend who had run out of gas and needed help. T.S. left to help his friend. T.S. returned in his own truck about an hour later and saw that Winkle's truck was stuck in the sand. Mendoza was on his hands and knees trying to get the truck out, and Winkle was standing over Mendoza yelling, "You ran over my dog. You killed my dog. You ran over my dog." T.S. saw one of the puppies was badly

3

injured. Mendoza asked T.S. to go and get a high-lift jack to help free the stuck truck.

T.S. walked away to look for the jack. As he did so, T.S. heard a loud pop, which he assumed was Winkle shooting the injured puppy to end its misery. After a 30-second pause, T.S. heard between six and nine more pops. When T.S. returned to the truck, he saw Mendoza's lifeless body and Winkle standing over him with a gun in his hand. Winkle was waving the gun frantically, and said, "you're not going to tell anyone, are you?" T.S. thought Winkle was going to kill him. Winkle asked T.S. to help him put Mendoza's body in the back of T.S.'s pickup truck to bury Mendoza in the desert. When T.S. refused, Winkle began waving his gun again at T.S. and cursing.

T.S. then ran over to his truck to get away. Winkle followed and took the keys out of T.S.'s ignition before T.S. could start the car. T.S. pulled out his phone to call 911. Winkle tried to wrestle the phone from T.S., but T.S. managed to hide it in his back pocket. Scared for his own life, T.S. offered to drive Winkle to Rancho Cucamonga or San Diego. Before they left, Winkle dragged Mendoza's body to a nearby camper and covered it.

T.S. and Winkle then drove off the property in T.S.'s truck. In an effort to get away from Winkle, T.S. abruptly drove onto R.H.'s property and into his car port. As the truck pulled up, R.H. came outside from his house. T.S. jumped out of the truck and frantically yelled, "Benny just shot Michael." As Winkle got out of the truck, the gun fell out of his belt buckle onto the ground. T.S. yelled at R.H. to grab the gun. R.H. quickly picked it up and set it near his house. R.H. told the men to leave.

T.S. then got back into his truck, drove away to where he could get cell phone reception, and called 911. Meanwhile, Winkle asked R.H. for the keys to R.H.'s car. When R.H. said no, Winkle fled on foot. Homicide detectives

4

arrived and collected the gun from R.H.'s residence. The gun's 13-round magazine was empty. Seven shell cases were found at the scene of the homicide and the parties stipulated that these casings were fired from the gun R.H. recovered from Winkle. During Mendoza's autopsy, law enforcement also recovered a bullet from his body that was fired from the same gun. In addition, Winkle's and R.H.'s DNA was found on the firearm.

The coroner determined Mendoza's cause of death was multiple gunshot wounds. He was shot a total of four times. One gunshot entered through his neck and hit his brainstem, which on its own, was fatal. Another gunshot entered through Mendoza's right armpit and exited through his left armpit, piercing both lungs. The third punctured his thigh. The fourth gunshot entered through the back of his right hand and exited his fingers—indicating a sharp downward trajectory consistent with a person holding out their hands to protect themselves.

After Winkle fled, the police began a manhunt. Aerial units searched using night vision, but were unsuccessful. Later that evening, police tracked Winkle's cell phone to Escondido. Surveillance footage showed Winkle emerge from the minivan he and Michael had driven to Anza in an In-N-Out parking lot, but he escaped apprehension. Thereafter, detectives created a wanted flyer for Winkle, which was disseminated through various media outlets. The flier held back information related to the homicide so that detectives could filter out false reports.

After the homicide, Winkle called L.N. and asked her to pick up the dogs he had left at the Anza property. Winkle did not tell L.N. any specifics about the homicide, but did tell her he did not want to make her "an accessory" and asked her to go to Costa Rica with him. L.N. testified she thought the conversation was strange.

5

Weeks later, around November 26, 2021, Winkle called E.M. E.M. thought the phone call was out of the ordinary, although they had spoken every year around the holidays since their breakup in 2011. Winkle asked E.M. to pick him up in Auburn, California and she agreed. When E.M. first joined Winkle, she thought he seemed paranoid. He asked her to drive him around to various locations. She did not know why and remained in the car at their stops. For several nights they stayed at different hotels in Northern California, and each time E.M. booked the room in her name.

Over the few days she was with Winkle, E.M. became increasingly suspicious. She did a Google search of his name on her phone and found an article with Winkle's picture stating he was wanted for murder. At one of the hotels, E.M. asked Winkle about the article. Winkle first told E.M. a false version of the events, which she did not believe. Winkle then told her that he and his friend were changing a tire on a car when the jack fell, killing his dog. Winkle referred to Mendoza by name and said he was upset by Mendoza's lack of remorse for killing the puppy. E.M. testified that Winkle told her, "something along the lines of, 'Don't poke the bear,' … don't mess with him." Winkle then told E.M. he held up his gun, and said to her, "boom, boom."

After hearing this, E.M. became scared. She told the jury that she was the most terrified she had ever been in her life and she thought she was going to die. Although Winkle had taken her car keys, she was able to get them back by telling Winkle she needed to go to the store for feminine products. Once she had her keys, E.M. went to her car, drove somewhere safe, and called the police. When she was interviewed by detectives, E.M. knew information about Mendoza's death that was not public, including Mendoza's identity, that a dog was killed, and that Mendoza had been shot in the chest.

6

Shortly after E.M. contacted police, Winkle was arrested at the motel where they were staying.

B. *Defense Case*

Winkle took the stand in his own defense. He stated he did not intend to kill his friend, he was very emotional over the death of the puppy and Mendoza's lack of sympathy for the dog, and he acted in the heat of passion. Winkle also admitted drinking a case of mini-Coronas that morning. He denied making any admissions to E.M. and said she misunderstood his comment about poking the bear.

C. *Charges, Conviction and Sentencing*

After his arrest, the Riverside County District Attorney charged Winkle with murder (Pen. Code, § 187, subd. (a); count 1[1]), dissuading a witness, T.S. (§ 136.1, subd. (a); count 2), and unlawful possession of a firearm by a prohibited person (§ 29800, subd. (a)(1); count 3). As to count 1, the information further alleged Winkle personally inflicted great bodily injury upon Mendoza (§ 12022.7) and personally and intentionally discharged a firearm (§ 12022.53, subd. (d)).

At the conclusion of the seven day trial, the jury found Winkle guilty of second-degree murder (count 1), not guilty of count 2, and guilty of count 3. The jury also found true the enhancement allegations related to count 1. On March 15, 2024, the court sentenced Winkle to a total term of 40 years to life in prison. Winkle filed a timely notice of appeal.

DISCUSSION

Winkle argues reversal is required because the jury was permitted to hear E.M.'s testimony that Winkle threatened her. He contends the court erred by admitting the evidence after it had ruled in limine that the

---

1    Subsequent undesignated statutory references are to the Penal Code.

7

testimony should be excluded as unduly prejudicial under Evidence Code section 352, and that the prosecutor committed misconduct by eliciting the testimony and stating that Winkle threatened to kill E.M. in his closing argument. Winkle also argues his trial counsel was ineffective for failing to object to the evidence and its use by the prosecutor.

I

*Additional Background*

Winkle's trial brief included a motion to exclude "evidence regarding alleged domestic violence." The motion stated Winkle was arrested after the Placer County Sheriff responded to E.M.'s report that "Winkle had assaulted her and threatened to kill her." The resulting sheriff's report also indicated E.M. had injuries to her nose and chin, and that she told the sheriff's deputies Winkle had taken her keys and told her she could not leave. Winkle sought to "prohibit the use of any evidence of assault, threats, or domestic violence as not relevant to these proceedings" and as "impermissible Evidence Code [section] 1101 character evidence."

At the pretrial conference on the parties' motions in limine, the prosecutor stated he did not intend to ask the details of the domestic violence that occurred before Winkle's arrest, but Winkle's demeanor at the time of his confession to E.M. was relevant to her credibility. The prosecutor stated, "while I don't think I need to go down the rabbit hole that 'You beat her up. You did this. You did that,' I think it is relevant to ask general questions in regards to the demeanor of the defendant during the time that the statements were revealed." Winkle's counsel responded that any type of violence or threat that Winkle made to E.M. was not relevant and any possible relevance was outweighed by its prejudicial effect under Evidence Code section 352. The prosecutor then reiterated his position that the

8

circumstances of Winkle's admissions to E.M., specifically his demeanor, were relevant to assessing E.M.'s credibility.

After further argument, the court stated it was overruling the defense motion and finding the threats made by Winkle at the time of his admissions to her were relevant to the case. After this initial ruling, the parties continued to argue about the relevance and potential prejudicial effect of the evidence. The court then partially changed its decision, stating: "I would allow the People to ask some questions about, you know, 'Was he aggressive with you? Was he, you know, angry? Menacing? Is that impacting on you today?' only if it appears to be relevant. In other words, if she says, 'No, I'm cool. Go ahead,' boom, then I don't think it would be relevant. But if she says, 'I'm really nervous and don't want to be here,' whatever she says like that, then I'll allow you to go, not all the way with it, but just use terms that are not so graphic and don't have so much to go towards our case. [¶] ... [¶] And so it would be 'At the time, was he angry? Was he upset? Was he menacing?' and that's it. That's all you need to do."

The court then stated its decision was "a good middle ground" and that it would not "let the People go all the way. I think it depends on how it all goes with the questioning, and if anybody wants to go further because of the way she's acting or whatever, then we'll stop and we'll have a little 402 about how much farther we can go."

At the start of her direct examination, E.M. stated she did not want to testify and was only doing so because she was subpoenaed. E.M. responded to the prosecutor's questions with one-word answers and stated she could not recall various details about her time with Winkle before she escaped and contacted police. She also stated she was unwilling to review the transcript

9

of her interview with investigators a few days after Winkle's arrest because it was too difficult.

When the prosecutor asked E.M. what Winkle told her about the murder, she stated Winkle first told her a different story, that the shooting was related to a gang fight, but that she did not believe him. E.M. testified Winkle next told her that "he and his friend were changing a tire on something, and that the jack fell and it killed the dog, and his friend, Michael, said something, and [Winkle] didn't like the reaction or what he said. And then he said something along the lines of 'poking the bear,' and then all he told me, he just held up his gun and said, 'boom, boom.'" The prosecutor asked E.M. what Winkle's demeanor was at the time. She responded he was angry and she "was terrified" because she "thought he was going to kill [her], too." The prosecutor then asked if Winkle threatened her, and his counsel objected based on relevance. The court overruled the objection and E.M. responded, "Yes."

The prosecutor also asked E.M. if, after hearing Winkle tell her he killed his friend, the hair on her back stood up. She answered, "Yes." Then the prosecutor asked her if this was "the most terrified [she] had been in [her] life?" and if she thought she was "going to die." E.M. responded yes to both questions. E.M. also testified that she escaped and called the police, "[b]ecause [she] was terrified for [her] life."

During the prosecutor's closing argument, he mentioned E.M. several times and twice briefly referred to Winkle threatening her life. In laying out the facts presented at trial, the prosecutor stated the killing was not done in the heat of passion and that when Winkle was "finally caught after evading police, day after day, week after week, seven weeks go by, *he threatens to kill [E.M.]*, and he reveals to you the exact reason why he killed Michael: You

10

don't poke the bear."  (Italics added.)  Then, in discussing E.M.'s credibility, the prosecutor emphasized that her testimony was not effectively impeached by the defense.  He stated: "Was she impeached about any single other statement she made on the stand, of statements she made to law enforcement on the day?  No.  She was scared to death.  She was in that room when she confronted him about it.  He told a side story, and then told her the real story, *and he threatened to kill her*.  He had the keys.  And so she pretended like she wasn't afraid and came up with a ruse to get out of that room.  'Hey, Ben, I need feminine products.'  Gone.  Called police.  And those statements, consistent."  (Italics added.)

## II

*The Court Did Not Abuse Its Discretion by Admitting E.M.'s Testimony*

### A

"No evidence is admissible except relevant evidence."  (Evid. Code, § 350.)  " 'Relevant evidence' means evidence … having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id.*, § 210.)  Evidence Code section 1101 states: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character ... is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ...) other than his or her disposition to commit such an act.  [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."  (See

11

*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238 (*Hendrix*) [Evidence of other crimes is admissible "when relevant for a noncharacter purpose"].)

Evidence Code section 1101, subdivision (a), makes evidence of a person's character, including evidence of the person's conduct on specific instances, inadmissible when offered to prove the person's conduct on a specific occasion. However, this provision does not preclude introduction of evidence of a person's prior bad acts for a different purpose, including "to support or attack the credibility of a witness." (Evid. Code, § 1101, subd. (c).) Further, evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore generally admissible. (*People v. Sandoval* (2015) 62 Cal.4th 394, 429–430; *People v. Valencia* (2008) 43 Cal.4th 268, 302; see Evid. Code, § 780.) An explanation of the basis for the witness's fear is likewise relevant to his or her credibility and is well within the discretion of the trial court to admit. (*People v. Burgener* (2003) 29 Cal.4th 833, 869 (*Burgener*).)

"Although a prior criminal act may be relevant for a noncharacter purpose to prove some fact other than the defendant's criminal disposition, the probative value of that evidence may nevertheless be counterbalanced by a section 352 concern. Evidence may be excluded under section 352 if its probative value is 'substantially outweighed by the probability that its admission [would] ... create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Hendrix, supra*, 214 Cal.App.4th at p. 238.) Accordingly, "the admissibility of uncharged crimes depends upon three factors: (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the material fact (i.e., probative value); and (3) the existence of any rule or policy

12

requiring the exclusion of relevant evidence (i.e., prejudicial effect or other § 352 concern)." (*Ibid.*)

The admission of evidence under Evidence Code section 1101 is addressed to the sound discretion of the trial court. (*People v. Memro* (1995) 11 Cal.4th 786, 864.) Accordingly, on appeal, a trial court's admission of such evidence is reviewed under the deferential abuse of discretion standard. (*People v. Gray* (2005) 37 Cal.4th 168, 202; *Memro*, at p. 864.) The trial court's ruling will not be disturbed on appeal absent a clear showing that the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1614.)

B

Winkle's threat to E.M. was relevant to understand E.M.'s attitude towards testifying and to explain the existence of a bias, interest, or other motive for her desire not to testify. (Evid. Code, § 780, subds. (f) & (j).) E.M. stated she did not want to testify against Winkle and would not have testified but-for the subpoena. E.M. also stated she could not recall details of the night she called police, refused to review her prior statement to police, and testified it was difficult for her to be in the courtroom with Winkle watching her. As the prosecutor anticipated before trial, E.M. feared testifying and was reluctant to do so. Without specific prompting by the prosecutor during her direct examination, she testified she feared for her life the night she called police. The basis for E.M.'s fear was relevant to assess her credibility on the stand. (See *Burgener, supra*, 29 Cal.4th at p. 869 ["Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible."]; and *People v. Mendoza* (2011) 52 Cal.4th 1056, 1086 ["evidence that a witness testifies

13

despite fear is important to fully evaluating his or her credibility"].) Indeed, Winkle tacitly admits as much in his opening appellate brief, noting E.M.'s state of mind "may be relevant to assessing her credibility as a witness."

Winkle argues E.M.'s testimony that he threatened to kill her is irrelevant to the ultimate issue of whether he made a "spur-of-the moment" decision to kill Mendoza. We disagree. E.M. was a pivotal witness and provided testimony that helped refute the defense theory that the killing was done in the heat of passion. Winkle's admission to E.M. tended to suggest the shooting was calculated and intentional. Because E.M. was an important witness for the prosecution's theory of homicide, the trial court properly admitted her testimony concerning the reason for her fear as relevant to assessing her credibility.

Winkle asserts the prejudice created by E.M.'s testimony substantially outweighed its probative value. Specifically, he argues that its relevance was limited because there was no indication her testimony "was suspect." However, Winkle's own testimony directly contradicted E.M.'s version of events. Her credibility was, thus, directly drawn into question by Winkle himself.

Winkle also argues the testimony was highly inflammatory and "would necessarily have the devastating impact of proof of criminal propensity, a propensity to contemplate murder." A court must balance the evidence's relevance against the danger that its admission will "necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." [However, t]he "prejudice" referred to in Evidence Code section 352 applies to

14

evidence which *uniquely* tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added.)

The evidence here was not as devastating as Winkle asserts on appeal. It paled in comparison to the other evidence concerning the crimes with which Winkle was charged. That evidence showed Winkle shot his unarmed friend multiple times while he kneeled, defenseless, on the ground. After the killing, Winkle turned to T.S. and insinuated he would harm T.S. if T.S. called the police. Ultimately, Winkle was charged with threatening to kill T.S. for reporting his crime.[2] This charged conduct, and the evidence submitted at trial about the crimes, was much more inflammatory than Winkle's verbal threat to E.M.

Further, the jury was never made aware that Winkle used physical force against E.M. or that E.M. suffered injuries, and the prosecutor never urged the jury to consider E.M.'s testimony as propensity evidence. Instead, the prosecutor referred to Winkle's threat against E.M. as a factor to consider in evaluating E.M.'s credibility. In sum, the probative value of E.M.'s testimony that Winkle threatened her was not substantially outweighed by its prejudicial effect in light of the totality of the evidence presented to the jury. The trial court did not abuse its discretion by permitting the challenged testimony.

---

[2]     As the Attorney General points out, the jury's verdict also suggests the limited testimony by E.M. did not have the prejudicial effect Winkle now assigns it on appeal. Of the charges, the crime most resembling the threat to E.M. was the threat to T.S. If the jury used the testimony as propensity evidence in the manner Winkle asserts, the more likely verdict for count two would have been guilt. Instead, the jury found Winkle not guilty of this crime, suggesting it did not draw inadmissible inferences from this evidence.

15

III

*There Was No Prosecutorial Misconduct*

Winkle next argues the verdict must be reversed because the prosecutor twice committed misconduct. He argues the prosecutor violated his rights by eliciting the challenged testimony that Winkle threatened E.M., and by focusing the jury's attention on this testimony in his closing argument, adding that "the threat was *to kill*" E.M.

A

" ' "A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects ' "the trial with unfairness as to make the resulting conviction a denial of due process." ' " ' [Citation.] Even if the behavior does not reach that level of egregiousness, it may still violate California law if it involves the ' "use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted." ' [Citation.] ' "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor." ' " (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1528.)

"A claim of prosecutorial misconduct is ordinarily preserved for appeal only if the defendant made 'a timely and specific objection at trial' and requested an admonition. [Citations.] ' "The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice." [Citation.]' [Citation.] Consistent with that purpose, '[a] court will excuse a defendant's failure to object only if an objection would have been futile'

16

[citation], or if an admonition would not have mitigated the harm caused by the misconduct [citations]. ' "[T]he absence of a request for a curative admonition' " may likewise be excused if ' " 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' " ' [Citation.] 'A defendant claiming that one of these exceptions applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.)

B

With respect to the prosecutor's comments during his closing statement that Winkle threatened E.M.'s life, his trial counsel did not object to the statements that he now claims constituted prosecutorial misconduct. Winkle argues there was no forfeiture of the issue because such an objection would have been futile and no corrective admonishment by the court could "unring the bell." However, he points to nothing in the record to support this assertion. Had Winkle raised an objection, it would have allowed the court to provide an admonishment to the jury to disregard the prosecutor's alleged misstatements before they began their deliberations. Accordingly, because Winkle's counsel did not object to the statements that he now asserts constituted prosecutorial misconduct, the issue is forfeited.

C

Even if the issue had been preserved for our review, we would not conclude the prosecutor's comments during his closing argument were error.

17

Likewise, E.M,'s testimony that Winkle threatened her was not the result of prosecutorial misconduct.[3]

"[I]t is misconduct for [a] prosecutor to state facts not in evidence or to imply the existence of evidence known to the prosecutor but not to the jury." (*People v. Smith* (2003) 30 Cal.4th 581, 617.) A prosecutor may not mischaracterize the evidence, refer to facts not in evidence, or even imply facts not in evidence. (*People v. Purvis* (1963) 60 Cal.2d 323, 343.) In determining whether a prosecutor's allegedly improper remark constitutes misconduct, the reviewing court must view the statement in the context of the argument as a whole. (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) When a misconduct claim focuses on comments the prosecutor made before the jury, the question is whether there is a reasonable likelihood the jury construed or applied any of the comments in an objectionable fashion. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Here, the prosecutor's comments during his closing argument were reasonable inferences based on the evidence presented. E.M. stated on multiple occasions she was afraid of Winkle after he confessed the murder to her. She described being the "most terrified" she had ever been in her life and that she believed her life was in danger while she remained with Winkle. During one exchange with the prosecutor, she stated that she thought Winkle was going to "kill [her], too." E.M. also testified Winkle threatened her. During his closing argument, when summarizing the evidence, the prosecutor stated twice that Winkle "threatened to kill her." While E.M. never directly testified to a specific threat, the prosecutor's comments were a fair deduction that could be drawn from E.M.'s testimony. E.M. testified that she believed

---

[3] Because we conclude there was no prosecutorial misconduct, we need not reach Winkle's claim of ineffective assistance of counsel based on his counsel's failure to object at trial.

18

her life was in danger in Winkle's presence, and it can be reasonably inferred her fear was the result of Winkle's threats.

With respect to Winkle's assertion that the prosecutor's questioning violated the court's in limine ruling, we also find no misconduct. During direct examination, after E.M. testified she was terrified because she thought Winkle was going to kill her too, the prosecutor asked E.M., "did he threaten you," defense counsel objected on the grounds of relevance, the court overruled the objection, and E.M. answered "yes." As discussed, before trial commenced, the court made a ruling in limine on the defense motion concerning the circumstances surrounding Winkle's confession to E.M. The issue was the subject of a lengthy debate between the court and the parties, but the court's ruling was not a model of clarity. At the end of the discussion, the court ruled it would permit questions about Winkle's demeanor at the time he confessed to E.M., and told the prosecutor not to use graphic terms.

Winkle describes the court's ruling as prohibiting the prosecutor from asking E.M. if Winkle had threatened her unless the court first conducted an additional hearing under Evidence Code section 402. The Attorney General disagrees with this interpretation. He asserts the court's ruling provided the prosecutor with more latitude, and permitted questioning concerning why E.M. was fearful, excluded graphic testimony concerning the domestic violence that had occurred, and allowed the issue to be reassessed as the testimony came in.

The Attorney General's understanding of the ruling is accurate and the prosecutor's questioning was in line with that understanding. After E.M. expressed hesitancy to testify, the court's ruling permitted the prosecutor to ask questions about her hesitancy in order to allow the jury to assess her credibility. The prosecutor did not elicit any specific facts about the violence

19

that may have occurred at Winkle's hands or any resulting injury, and he did not explicitly ask whether Winkle threatened to "kill her." The prosecutor did not use "graphic" terms or elicit testimony of facts that were similar to the charged violence. The prosecutor's questioning, thus, did not run afoul of the court's ruling. Indeed, when the prosecutor asked E.M. what Winkle's demeanor was after he admitted killing Mendoza, she volunteered the fact that she was terrified of him and thought Winkle was going to kill her too.

In sum, the prosecutor's question did not constitute prosecutorial misconduct and reversal on this basis is not warranted.

## DISPOSITION

The judgment of conviction is affirmed.


McCONNELL, P. J.

WE CONCUR:


DO, J.


BUCHANAN, J.

20